UNITED STATES DISTRICT COURT
EASTERN DISTSRICT OF NEW YORK
------------------------------------------------------------X
JACK S. KANNRY and JOYCE F. KANNRY,　　　)
　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　)　　　Case No. _____
　　　　　　　　　　　Plaintiffs,　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　)　　　**COMPLAINT**
　　　　　　-against-　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　)
LIBERTY MUTUAL GROUP INC.,　　　　　　　　)　　　**JURY TRIAL DEMANDED**
acting by and through its LIBERTY　　　　　　　)
MUTUAL FIRE INSURANCE COMPANY,　　　　)
　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　Defendants.　　　　　　　)
------------------------------------------------------------X

　　　　Plaintiffs by their undersigned attorneys, for their complaint against the defendants, allege:

### Parties, Jurisdiction and Venue

1. At all times hereinafter mentioned, plaintiffs were and are residents of the State of New York, and the owners of a single family residence located at 457 East Penn Street, Long Beach, NY, in the County of Nassau and State of New York (the "dwelling").

2. At all times hereinafter mentioned, defendants were and are foreign business corporations, created and existing under the laws of the State of Massachusetts, with offices and principal place of business located at 175 Berkeley Street, Boston, MA 02116, and authorized to conduct business in the State of New York.

3. The business activities of defendants in the State of New York have been and continue to include the providing of flood insurance policy coverage under the National Flood Insurance Program ("NFIP"), with flood insurance annual premiums to be paid to defendant Liberty Mutual Fire Insurance Company. All subsequent references in this complaint to acts and omissions of defendant and its representatives are to defendant Liberty Mutual Fire Insurance

Company and, on information and belief, on behalf of its parent company, Defendant Liberty Mutual Group Inc.

4. Jurisdiction of this Court in this action is founded on diversity of citizenship, with the matter in controversy exceeding the sum of $75,000, exclusive of interest and costs, pursuant to 25 U.S.C. § 1332.

5. Venue in this action is proper in this judicial district, in which a substantial part of the events or omissions giving rise to the claim occurred, pursuant to 28 U.S.C. § 1391(a) (2), together with the corresponding venue requirement in the related insurance policy at issue.

## Nature of Action

6. This is a civil action brought by plaintiffs against defendant insurance companies to recover damages for uncompensated costs and losses arising out of the wrongful conduct of defendant, its employees, agents and other authorized representatives in the manner in which it and they handled and then denied a substantial part of plaintiff's dwelling and contents flood claim caused by Hurricane/Super Storm Sandy, which conduct was precluded by defendant's waiver, estoppel and negligent misrepresentations upon which plaintiffs relied to their detriment (Counts I, II and III), and also constitutes one or more breaches by defendant of its requisite covenant of good faith and fair dealing, warranting counsel fees, as consequential damages (Count IV); and finally, entitling plaintiffs to punitive damages arising out of the misleading misrepresentations in defendant's flood insurance Renewal Declarations under its standard flood insurance policy, as constituting tortious conduct against the general public as well as against plaintiffs (Count V).

## Facts

### Flood Insurance Policy Coverage

7. At all times hereinafter mentioned, defendant has provided flood insurance policy coverage to plaintiffs for the dwelling's building and contents, in specified coverage amounts, as set forth in an annual Renewal Declarations form, and plaintiffs have timely paid the annual premiums for such flood insurance coverage.

8. At all times hereinafter mentioned, the annual flood insurance Renewal Declarations furnished by defendant for plaintiff's dwelling described the insured building for coverage purposes as: "three or more floors with finished basement, building is a single family residence, non-elevated building"; and the insured contents, also for coverage purposes, as "contents are household, located basement/enclosure and above".

### Prior Dwelling Claim and Defendant's Processing

9. In October 2005, several days of continuous heavy rainfall caused ground water below the dwelling to rise above its normal level, with the volume of such water in and around plaintiff's dwelling being too great for disposal via an existing sump pump and underdrain system, resulting in a flood condition at the dwelling, with significant water damage to both the building and contents.

10. Following the reporting of such flood damage claim to defendant, it dispatched a flood claims adjuster to the dwelling, who was, upon information and belief, a FEMA ("Federal Emergency Management Administration") certified flood appraiser/adjuster, and he met with plaintiffs, inspected the premises, took measurements and photographs, prepared and furnished a detailed estimate and report of claim recovery entitlement under plaintiffs' flood insurance
{825082.1}  3

policy, which, upon information and belief, was then reviewed and approved by both a defendant flood claim examiner and a defendant underwriter, in the normal course of defendant's process for handling such claims.

11. In early 2006, following determination and concurrence among the defendant flood adjuster, flood claims examiner and underwriter, that the water damaged building and contents at the dwelling did not constitute a "basement" within the severely restrictive coverage limitations established by FEMA under the NFIP, defendant fully paid to plaintiffs the flood claim amount, within the specified building and contents coverage amounts set forth in the then applicable annual Renewal Declaration, less required depreciation and specified deductible amounts.

## Current Flood Claim and Defendant's Processing at Issue

12. On October 29-30, 2012, Hurricane/Super Storm Sandy struck the Long Beach NY area and many neighboring communities, and deposited approximately 3 ½ feet of contaminated ocean water, backed up sewage and fuel oil in the finished and fully furnished lower floor of plaintiff's dwelling (comprising a family room; home office/den; bedroom; bathroom; utility room with boiler, hot water heater, clothes washer and dryer, cedar storage closet, and central air conditioning air handler and duct bank leading to living areas of the dwelling; and a one car garage with remote controlled garage door). Exterior dwelling damage included significant debris in the front and side yards, together with a fallen tree.

13. Immediately thereafter, plaintiffs reported the flood claim for building and contents loss at the dwelling to a defendant flood claims department representative, who assigned a claim number and advised that plaintiffs would shortly be contacted by a defendant assigned flood adjuster, who would thereafter be defendant's point of contact for plaintiffs until final disposition of the claim, precisely the same procedure as with the 2005 flood claim.

14. In November 2012, the defendant's assigned flood adjuster who, upon information and belief, was a FEMA certified flood insurance claim adjuster, visited the dwelling, inspected and photographed the building exterior and interior, as well as the flooded contents in the lower floor finished and furnished rooms, utility room and garage, and advised plaintiffs that the floor level was close enough to the adjacent ground in elevation to be considered a lower level or first floor, under applicable FEMA guidelines, and would be treated as such for flood insurance coverage purposes.

15. At that initial visit to the dwelling, said defendant flood adjuster further advised that all of the contents in the lower floor of the dwelling would have to be discarded as debris by plaintiffs due to contaminated water infiltration, noting also that initial mold growth was already evident on such contents as well as on the walls of the lower floor rooms, which would require immediate attention and treatment by a remediation/mitigation contractor.

16. During that same visit to the dwelling, defendant's flood adjuster requested that plaintiffs take notes as to his specific instructions for the requisite supporting documentation he would need from plaintiffs to process the flood insurance claim.

17. The instructions from defendant's flood adjuster on that occasion included a detailed report in a specified building computer program format and invoice from the remediation contractor to be retained; an estimate from the proposed general contractor for needed restoration work; invoices or estimates and letters of necessity from the plumber, electrician and air conditioning contractor.

18. Specifically emphasized by defendant's flood adjuster, at that time, was the importance of an inventory by plaintiffs and corresponding photographs for each contents item prior to being discarded as debris, from the largest items of a Brunswick pool table and built-in burl wood bar, to the smallest chair, table and even books, since he advised that was essential for claim processing and obtaining contents insurance payment.

19. Lastly, during that November 2012 dwelling visit, defendant's adjuster also advised that he would be reserving, on behalf of defendant, a total of $120,000 to $140,000 as a contemplated dwelling and contents claim recovery projected range under plaintiffs' flood insurance policy.

20. Shortly thereafter, plaintiffs retained a remediation contractor to perform initial drying out of the lower floor of the dwelling; removal of saturated drywall boards, wainscoting wood panels and vinyl floor tiling; interior doors; and contents disposal as debris, following extensive inventorying and photographing for defendant's flood adjuster.

21. In the same time period, plaintiffs also retained plumbing and electrical contractors for removal of the existing contaminated boiler and hot water heater, as well as disconnecting of gas and electric service to contaminated areas; and an air conditioning contractor for removal of

existing utility room air handler and floor level duct for the central air conditioning system at the dwelling, together with, an exterior ground level A/C condenser, which had also been saturated with contaminated ocean water.

22. On February 20, 2013, plaintiffs' total flood damages claim with extensive supporting documentation was submitted to defendant's flood adjuster in a bound volume with a tabbed schedule of exhibits, plus a CD of approximately 100 photographs of contents and principal dwelling components to be discarded, all precisely in accordance with the prior instructions of defendant's flood adjuster.

23. That submitted flood claim comprised an amount of $101,224.42 for building loss items, well within the flood insurance policy limit, and $48,250 for contents items, reduced to the contents insurance coverage cap of $20,000, for a total flood claim of $121,224.42, which coincidentally was at approximately the low end of the previously indicated reserve range for this claim by defendant's flood adjuster.

24. Notwithstanding all of the foregoing representations by defendant's flood adjuster, his March 15, 2013 total claim estimate and report showed that, wholly contrary to his prior statements and instructions to plaintiffs, he had treated the plaintiffs' claim as a FEMA "basement" claim, allowing virtually nothing for contents and sharply reduced amounts for the building losses and damages, resulting in a claim determination approximating one-third of the amount previously reserved by him on this claim.

25. On the basis of that flood adjuster's claim estimate and report, defendant transmitted to plaintiffs two checks, each dated March 21, 2013, and marked "Loss Paid Final", totaling $4,346.39, which, together with two earlier advance partial payments totaling $30,000.00, resulted in defendant's payment to plaintiffs for this flood damages insurance claim aggregating $34,346.39.

26. At about the same time, in March 2013, defendant's flood claim department transmitted an undated form letter to plaintiffs, confirming defendant's implementation of a rapid claims payment process for this flood event, in lieu of usual FEMA requirements, advising that defendant would "pay a loss based on the evaluation of damages in the adjusters report…as soon as practicable after the insurer receives and reviews the adjuster's report."

27. Phone calls and e-mail communications then followed between plaintiffs and a defendant designated claim examiner who, upon information and belief, was authorized as defendant's representative to review and approve the adjuster's report or direct that it be revised, and in which communications plaintiffs described a number of claim entitlement areas apparently overlooked by defendant's flood adjuster, even beyond his above described position reversal on lower level contents coverage.

28. In an April 16, 2013 phone conversation, following his review of the previously described submittals and communications, defendant's claim examiner advised that defendant would allow full payment of plaintiffs' flood claim for contents, plus all appropriate related building claim items, which he had directed to be reevaluated by a replacement flood adjuster, in view of the lack of confidence engendered by the initial defendant's flood adjuster.

29. Notwithstanding the foregoing clear communications, which had seemingly established an acceptable basis for resolving this flood insurance claim by supplemental payment for the full contents loss and of the building loss payments entitlement reevaluation by defendant's replacement flood adjuster, consistent with the contents determination and other "good points" raised by plaintiffs, as conceded by defendant's claim examiner, that mutually agreed status was then totally reversed by said claim examiner, apparently in part due to defendant's assigned underwriter thereafter refusing to approve the foregoing.

30. By letter dated June 4, 2013, defendant's claim examiner denied plaintiffs' claim for supplemental payment on the contents loss and, in subsequent correspondence, effectively did so with respect to the building loss claim, unless plaintiffs were willing to comply with the FEMA insurance policy proof of loss requirements, which determination absolutely ignored and was contrary to the previously established and superseding rapid claims payment process by defendant, as summarized in paragraph 26 of this complaint, and which had previously been fully complied with by plaintiffs, insofar as all required submission for that process.

31. Such final determination by defendant resulted in its payments to plaintiff being limited to $34,346.39 on the total flood claim of $121,224.42.

## COUNT I
### Waiver and Estoppel

32. At the time of the prior October 2005 dwelling flood, as set forth in paragraph 9 of this complaint, the flood insurance policy issued by defendant to plaintiffs for building and contents loss at the dwelling, as well as the applicable FEMA guidelines, and the configuration and elevation of the dwelling lower floor in proximity to the surrounding adjacent ground, were

{825082.1}  9

identical to the flood insurance policy, FEMA guidelines and dwelling configuration and lower floor elevation in existence at the time of the October 2012 Hurricane/Super Storm Sandy flood.

33. The flood claim processing procedure by defendant for the October 2005 flood, comprising an initial FEMA certified flood appraiser/adjuster inspection of the premises, measurement and photographs, followed by his detailed estimate and report of claim recovery and entitlement, which was then reviewed by a defendant claim examiner and underwriter, was essentially identical to the flood claim processing procedure implemented by defendant for the October 2012 Hurricane/Super Storm Sandy flood, except for plaintiffs being required to prepare substantial data and documentation for the more recent event.

34. Consistent with the determination by the defendant's flood appraiser/adjuster on the October 2005 flood, as set forth in paragraph 11 of this complaint, the initially assigned defendant flood adjuster on the October 2012 flood likewise concluded that the water damaged building and contents at the dwelling did not constitute a "basement" under FEMA guidelines, and instructed plaintiffs to discard all such contents as contaminated, after full inventory and photographs of each item, to assure that there was an adequate record for full contents and related building loss payment under the flood insurance policy.

35. Plaintiffs were entitled to rely, and did in fact rely to their detriment, upon the defendant's earlier determination in 2006 of plaintiffs' full flood insurance entitlement for the contents and building loss in the dwelling lower floor, as well as on the wholly consistent representations of the defendant's more recent flood adjuster, including the defendant's reserve established for such flood claim, following the 2012 Hurricane/Super Storm Sandy flood.

36. Rather than endeavoring to salvage, dry, clean and restore any of the contaminated contents, plaintiffs followed the November 2012 instructions of the defendant flood adjuster in discarding such contents as debris. Similarly, as to the elements of the building loss, no effort was made to salvage and restore these items on the basis of such properly placed reliance.

37. As a result of the above course of consistent conduct, upon which plaintiff properly relied, defendant has waived any right to deny the unpaid balance of plaintiffs' flood insurance claim, and is further estopped from denying plaintiffs' claim for supplemental payment of their building and contents flood loss at the dwelling.

38. By reason of the foregoing, plaintiffs have been damaged and are entitled to recover from defendant their claimed damages in the amount of $121,224.42, no part of which has been paid by defendant, despite due demand therefor, except the sum of $34,346.39, leaving a balance due and owing of not less than $86,878.03, subject to the proofs at trial, which amount is justly due and owing from defendant to plaintiffs, with appropriate interest thereon.

## COUNT II
### Misrepresentations

39. The initial representations of material facts by both defendant's flood adjuster and claim examiner that plaintiffs would be compensated under the flood insurance policy for the contents and related building loss items, due to the 2012 flood, were honestly and reasonably relied upon by plaintiffs in discarding the contaminated contents and in entering into contractual arrangements for subsequent restoration work at the dwelling.

40. The subsequent reversal of positions, initially by defendant's flood adjuster and subsequently by its claim examiner, resulting in a denial of any supplemental claim payment, created an earlier inconsistent misrepresentation of such material facts, that defendant knew or should have known plaintiffs would rely upon.

41. By reason of the foregoing, plaintiffs have been damaged and are entitled to recover from defendant their claimed damages in the amount of $121,224.42, no part of which has been paid by defendant, despite due demand therefor, except the sum of $34,346.39, leaving a balance due and owing of not less than $86,878.03, subject to the proofs at trial, which amount is justly due and owing from defendant to plaintiffs, with appropriate interest thereon.

## COUNT III
### Contractual Misrepresentation

42. At all times hereinafter mentioned, and to date, the annual flood insurance Renewal Declarations with coverage and premium amounts, as more fully set forth in paragraphs 7 and 8 of this complaint, provided for total building coverage at $250,000 and total contents coverage at $20,000, recently increased to $21,000.

43. The denial of any supplemental claim payment by defendant, with very limited building coverage and nominal coverage, of less than $1,000, for contents loss, being allowed, yields the conclusion that such flood insurance coverage is absolutely worthless to plaintiffs for their contents loss, if the dwelling lower floor is deemed a basement under FEMA guidelines, as well as being significantly reduced in value for building loss, and that the annually assessed and paid premium would only provide meaningful coverage in the event of a tsunami type flood, where

ocean waters would surge to heights of twenty feet or more on an upper floor of the dwelling, which has never occurred in recorded history for this part of the world.

44. Consistent with that conclusion was the phone statement by defendant's claim examiner, in or about June 2013, that contents in a FEMA defined basement are, for the most part, not covered under flood insurance, and that any such contents placed in plaintiffs' dwelling were at their own risk and peril for any flood loss that might occur.

45. Those defendant positions are belied by a reasonable reading of defendant's annual flood insurance premium renewal statement and the aforementioned Renewal Declarations, which set forth the amount of coverage for building and for contents, with the seemingly clear definitions that the coverage for plaintiffs' building applies to "three or more floor with finished basement" and for plaintiffs' contents, which are "household, located basement/enclosure and above."

46. Accordingly, if the above defendant interpretation is construed as being proper, then the flood insurance policy is grossly misleading and has misrepresented to plaintiffs, and no doubt to innumerable other flood policy insureds, as to the significant lack of coverage for dwellings with" basements", which is where most floods occur in such type of dwellings.

47. During the period since the October 2005 flood at plaintiff's dwelling, when defendant honored a reasonable interpretation of the flood insurance policy and paid for the building and contents loss in the dwelling lower floor, plaintiffs have paid to defendant an annual flood insurance premium averaging approximately $1,675 for eight years, from 2007 to 2014, for a

total of $13,400, to obtain flood insurance coverage that was, in reality, not available or being provided by defendant.

48. During that eight year period, plaintiffs honestly and reasonably relied to their detriment on the flood insurance coverage believed to be in place for their dwelling lower floor building components and contents, and the misleading misrepresentations in defendant's flood policy document, as set forth in paragraph 45 of this complaint, were known or should have been known to defendant as being relied upon by plaintiffs for protection of their building and contents against flood losses.

49. By reason of the foregoing, plaintiffs have been damaged and are entitled to recover from defendant their claimed damages in the amount of the aforesaid flood insurance premiums, $13,400, less an amount to be determined for the reasonable premiums applicable to the real coverage afforded, all subject to the proofs at trial, which amount is justly due and owing from defendant to plaintiffs, with appropriate interest thereon.

## COUNT IV
## Bad Faith Consequential Damages

50. Defendant breached its requisite covenant of good faith and fair dealing by its wrongful course of conduct, in the handling and adjustment for plaintiffs' flood insurance claim, as described above in this complaint, including its knowingly inconsistent denial position as to flood claim compensable coverage as compared to its prior approval position as to an earlier flood claim with identical coverage at the same dwelling; its improper instructions and misrepresentations to plaintiffs, through its flood claim adjuster, upon which plaintiffs rightfully relied to their detriment, and similarly as to the misrepresentations by defendant's flood claim

examiner; and its misleading and deceptive misrepresentations in its Renewal Declarations for the subject flood insurance policy, both as to the coverage afforded and the premiums it charged for what amounted to unavailable coverage; with an ultimate unjustified denial by defendant of a substantial portion of plaintiff's flood insurance claim.

51. The aforesaid bad faith conduct by defendant is also violative of New York's Insurance Law §2601, Unfair Claims Settlement Practice, and General Business Law §349, Deceptive Business Practices.

52. By reason of the foregoing, plaintiffs have incurred consequential damages for counsel fees in the prosecution of this litigation, which fees were within the contemplation of the parties and a foreseeable consequence of defendant's bad faith conduct, and plaintiffs are entitled to recover from defendant such claimed consequential damages in an amount based upon the prevailing time billing rates for plaintiffs' counsel, applied to the actual time expended herein, all subject to the proofs at trial, which amount is justly due and owing from defendant to plaintiffs, with appropriate interest therein.

## COUNT V
### Punitive Damages

53. At all times hereinabove mentioned, and upon information and belief, defendant has provided flood insurance coverage for any homeowners requiring such insurance in flood prone areas in the New York, New Jersey and other parts of the country, similarly situated as plaintiffs, including the same misleading and deceptive misrepresentations in its Renewal Declarations for the literally thousands of such insuring homeowners who suffered basement or lower level building and contents flood damages caused by Hurricane/Super Storm Sandy.

54. By virtue of the substantial magnitude of homeowners suffering from nonpayment of such flood insurance claims in New York, New Jersey and other parts of the country, the foregoing morally reprehensible and egregious conduct was directed at the general public at large, with homes in flood prone areas, as distinct from the above similar private wrongs suffered by plaintiffs and complained of in this complaint.

55. The very nature of defendant's flood insurance contractual obligation, to countless homeowners seeking such coverage protection, and the corresponding public interest in seeing it performed with reasonable care, created an independent duty upon defendant of reasonable care in the performance of such contractual obligation, which gave rise to a tortious wrong, for which punitive damages are actionable.

56. By reason of the foregoing, plaintiffs are entitled to recover from defendant an amount for punitive damages, to be determined and subject to the proofs of trial, which amount is justly due and owing from defendant to plaintiffs, with appropriate interest thereon.

## Trial by Jury Demand

57. Pursuant to Fed. R. Civ. P. Rule 38, plaintiffs demand a jury trial for all the issues set forth in this complaint, which are triable of right by a jury.

WHEREFORE, plaintiffs JACK S. KANNRY and JOYCE F. KANNRY demand judgment against defendants, LIBERTY MUTUAL GROUP INC. and LIBERTY MUTUAL FIRE INSURANCE COMPANY, jointly and severally, as follows:

a. On Count I, or in the alternative on Count II, in an amount based upon the proofs at trial, but not less than the sum of $86,878.03;

b. On Count III, in an amount based upon the proofs at trial, but not less than the sum of $13,400.00, less a credit to be determined as set forth above;

c. On Count IV, in an amount for counsel fees as consequential damages, based upon the proof's at trial; and

d. On Count V, in an amount for punitive damages, based upon the proofs at trial;

together with, for each of the foregoing counts, appropriate interest thereon, and the costs and disbursements of this action.

Dated: New York, NY
       March 5, 2014

                                WARSHAW BURSTEIN, LLP
                                Attorneys for Plaintiffs

                                By: /s/ Jack S. Kannry
                                Jack S. Kannry (JK6237)
                                555 Fifth Avenue
                                New York, NY 10017
                                (212) 984-7720