UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
IN RE HURRICANE SANDY CASES
------------------------------------------------------------------X
JACK S. KANNRY and JOYCE F. KANNRY,  )
                                                                       Plaintiffs,  )      Case 2:14-cv-01539-GRB

             -against-  )      PLAINTIFFS AFFIDAVIT IN
                                         )      OPPOSITION TO DEFENDANT
LIBERTY MUTUAL GROUP INC.,  )      MOTION AND IN SUPPORT
acting by and through its LIBERTY  )      OF CROSS-MOTION FOR
MUTUAL FIRE INSURANCE COMPANY,  )      <u>SUMMARY JUDGMENT</u>

                                  Defendant.  )
------------------------------------------------------------------X
STATE OF NEW YORK   )
COUNTY OF NEW YORK ) ss.:

    JACK S. KANNRY, being duly sworn, deposes and says:

    1. Deponent is a plaintiff in the above captioned action, is personally familiar with the facts, events, circumstances, proceedings had and documents served herein. The statements herein are true, based on his own personal knowledge or on information and belief, and which latter statements he believes to be true, as set forth below.

    2. Such statements as are true to deponent's own personal knowledge are those relating to activities, occurrences and events, including meetings, phone conversations, e-mails an<u>d other</u> correspondence with defendant representatives, in which deponent directly participated. Statements attributable therein to defendant representatives are offered to evidence that they were made to plaintiffs, and not necessarily for the truth of their content.

{851097.1 }

3. Such statements as are true on information and belief are based upon deponent's review of identified documents produced to plaintiffs by defendant from its Claim File and its Underwriter File, as well as any referenced documents and procedures directed to flood policy insureds, generally, and not solely to plaintiffs, specifically.

4. This affidavit is submitted in opposition to defendant's motion for summary judgment, to dismiss plaintiffs' claims against defendant as purportedly being barred by the application of federal flood insurance statutory requirements and related flood insurance policy requirements and limitations. However, as set forth in the complaint herein, and as further supported below and in the attached exhibits, as well as in the accompanying memorandum of law, plaintiffs pleaded claims are for tortious wrongs by the defendant, directly, and not as an agent of FEMA, and which pleaded claims are not at all factually the subject of the pending motion by defendant.

5. This affidavit is additionally submitted in support of plaintiffs' cross-motion for summary judgment against defendant for liability only as to the actually pleaded claims.

**Factual Support for Plaintiffs Cross-Motion**

6. Since plaintiffs' opposition to defendant's summary judgment motion is predicated upon said motion being addressed to claims not asserted by plaintiff in this litigation, no factual opposition is really warranted to the defendant's factual position, i.e., that (1)"[p]laintiffs failed to provide a pre-suit, signed and sworn proof of loss, …(2) [p]laintiffs have breached the terms of their SFIP by failing to cooperate with the adjuster assigned to investigate their claim…and…(3) [p]laintiffs are limited to recover only those items that are afforded coverage pursuant to SFIP Article III (A) (8) and III (B) (3)." (defendant's notice of motion, p.2., last two para.) Plaintiffs have not addressed defendant's factual averments (1) and (3), since those points in its summary judgment motion have

been made in relation to unpleaded federal claims. However, as to (2), albeit also suffering from the same impediment, the chronological facts stated below will clearly demonstrate that, not only did plaintiffs fully cooperate with defendant's flood adjuster assigned to investigate the claim, by providing him with two separate dwelling inspections for measurements and photographs, but they also followed his instructions to the letter, in extensive preparation and submittal of their claim itemization and documentation.

7. Turning to the factual support for plaintiffs' cross-motion, the Court is initially referred to the respective Local Rule 56.1 statements of plaintiffs (Exhibit 3) and of defendant (Exhibit 4), with particular emphasis on the largely supportive averments by defendant counsel (either by admission or DKIs as to facts reasonably expected to be within defendant's knowledge), seemingly intended to be responsive to each of plaintiffs' numbered factual statements.

### Pre-Floods Facts

8. In 2005, as well as for several years prior thereto, and continuously thereafter to the present, plaintiffs were and are the owners of a single family residence located at 457 East Penn Street, Long Beach, New York (the "dwelling").

9. During the aforesaid entire period, defendant has provided flood insurance policy coverage to plaintiffs for the dwelling building and contents, in specified coverage amounts, as set forth in annual defendant Renewal Declaration forms, and plaintiffs have timely paid the annual required premiums for such flood insurance coverage.

10. Defendant's annual Renewal Declarations for plaintiffs' dwelling described the flood insured building for coverage purposes as "three or more floors with finished basement, building is a

single family residence, non-elevated building"; and the insured contents, also for coverage purposes, as "contents are household, located basement/enclosure and above." Illustrative is the Renewal Declaration form applicable to the Hurricane Sandy coverage period of 3/15/12 to 3/15/13 [Exhibit 5, document UW000144 from defendant UDW (underwriter) file].

11. Concurrently with the annual Renewal Declarations, defendant has provided plaintiffs with a booklet, entitled "National Flood Insurance Program Flood Insurance Claims Handbook"(Exhibit 6), which, in part, advised homeowners as to the following, concerning the role of the insurer's flood adjuster:

- "…prior to signing an agreement/contract with a cleaning, remediation, or maintenance contractor, you should consult with your flood insurance adjuster or flood insurer concerning coverage." (p. 4).
- "be assured that your adjuster will be an experienced claims professional and will notice many points of damage you could overlook." (p. 5)
- "you should also be aware that adjuster cannot approve (or disapprove) your claim, or tell you when or if the insurance company will approve it."[1](p. 5)
- "talk with your adjuster, who has more knowledge about your claim than anyone". (p. 8).

### 2005 Flood At Dwelling

12. In October 2005, several days of continuous heavy rainfall caused the ground water level below the dwelling to rise above its normal level, resulting in a flood condition at the dwelling,

---

[1] However, in the instance of Hurricane Sandy, as discussed below (para. 26) defendant transmitted a written notice as to a rapid claim process for Hurricane Sandy, under which defendant would adjust and pay a loss based on the evaluation of damages in its adjuster's report.

{851097.1 }  4

with significant water damage to both the building and contents at the finished basement or lower floor level.

13. The annual defendant flood policy declarations encompassing the period of the 2005 dwelling flood, an earlier edition of the same form for the Hurricane Sandy period (Exhibit 5), specifically states that the building is a single family residence with three or more floors and a finished basement, and that the contents location for insurance coverage under that policy is described as "basement and above" (Exhibit 7).

14. Upon deponent reporting such flood claim to defendant, it dispatched Daniel Cole, a FEMA certified flood adjuster, to the dwelling, who met with plaintiffs, inspected the premises, took measurements and photographs, prepared and furnished a detailed estimate and report, recommending full claim entitlement on the building and contents claim, within the coverage limits of the policy, with the payable amounts determined to be $20,304.05 and $14,900.00, respectively, less applicable deductibles, the latter amount being the contents coverage limit (Exhibit 8).

15. The final loss report by defendant flood adjuster Daniel Cole was then submitted to and reviewed and approved by a defendant claims examiner and an underwriter, and such flood claim fully paid by defendant (Exhibit 9).

16. Defendant's summary description for the 2005 flood claim is set forth in its document entitled "Claims History", which specifically notes the contents location to be "finished basement/enclosure" and the contents coverage and contents paid amount to be $14,900. (Exhibit 10, Document PC000193 from defendant's Claim File). Notably, the only dispute that defendant alleges was that this document, which was prepared on a Liberty Mutual Fire Insurance Company form, "was

created by Keith Shackelford with the National Flood Insurance Program, not by Liberty Mutual." (Exhibit 4, defendant 56.1 statement, p. 2, para. 7), clearly, a higher authority than defendant in the WYO chain of command that it relies upon.

17. As an apparent part of defendant's review of plaintiffs' subsequent Hurricane Sandy flood claim, to be further discussed in this affidavit, its assigned claims examiner, Jeffery Carter, stated in a chronology of claim activities the following for an entry dated April 16, 2013, relating to the 2005 flood claim.

> Pulled the prior file and reviewed the content. The prior loss has photos which show the walk out of the basement. Therefore, we now have coverage for the contents and additional dwelling items. I will send FG[2] a request to review the file and let them know the area is not rated as a basement." (Exhibit 11). Document PC000028 from defendant Claim File.).

Notably, in its 56.1 statement, defendant admits that to be an accurate representation of defendant's log notes, although cryptically suggests a dispute as to the speculated "purpose, motive or meaning behind the cited passage", when obviously there need be none, since that record speaks for itself (Exhibit 4, defendant 56.1 Statement, p. 3, para. 8).

18. Following the 2005 flood claim and its subsequent resolution by defendant's payment for the building and contents losses, plaintiffs had repaired, reconstructed and replaced the damaged building and contents elements, including the restoration of the dwelling's finished basement, and at a cost in excess of defendant's payment. A confirming note is to be found in a FEMA "final report", dated March 20, 2013 (Exhibit 12), which includes a section on "Premises History", referring to the

---

[2] The reference to FG is believed to be for the Fountain Group, an entity retained by defendant for flood adjuster services on its behalf after Hurricane Sandy.

{851097.1}                                6

prior 2005 loss building payment of $20,304.05, and noting that "Repairs completed". (Defendant's document PC000052 from its Claim File).

### 2012 Hurricane Sandy Flood at Premises

19. On October 29-30, 2012, the finished and fully furnished basement or lower floor of plaintiffs' dwelling was inundated with approximately 3 ½ feet of contaminated ocean water, sewage backup and fuel oil from Hurricane Sandy, which flooding also caused exterior building damage.

20. Upon deponent's initial phone report of dwelling flood damages to defendant's flood claim office, he was advised by a defendant flood claim representative that a FEMA certified flood adjuster would be assigned, and would be the principal point of contact for plaintiffs with defendant throughout the flood claim investigation, reporting and payment process to follow.

21. Defendant thereupon dispatched a FEMA certified flood adjuster, Daniel Alexander, to the dwelling, whose initial meeting with plaintiffs occurred on November 22, 2012, at which time such flood adjuster inspected and photographed the building exterior and interior, as well as the flooded contents, and measured the water line of the flood water at its peak.

22. During that initial dwelling inspection, defendant's flood adjuster Alexander advised plaintiffs that, under FEMA guidelines, the lower floor of the dwelling would not be classified as a basement for flood insurance coverage purposes[3], which advice was confirmed in Alexander's February 6, 2013 signed FEMA "Preliminary report" (Exhibit 13), which includes a section entitled "Contents", that notes that "[c]ontents are household" and that "[c]ontents located in first floor and

---

[3] Included in defendant's motion papers is an affidavit of Doreen Decker, flood insurance services claims manager, who states under oath that "upon Daniel Alexander's inspection, it was determined that the lower portion of the property was below grade on all sides, thereby constituting a basement under the SFIP" (p. 4, para. 12). Although Decker does not offer any factual support for that conclusion, it is clearly contrary to what flood adjuster Alexander stated to plaintiffs and wrote in his preliminary report discussed above.

{851097.1}                              7

above" with no check off at the form box labeled "contents located in basement" (Document PC 000035 from defendant's Claim File).

23. During that same initial dwelling inspection, flood adjuster Alexander instructed plaintiffs to discard as debris, all of the lower floor contaminated contents, and to provide a detailed flood claim report with requested invoices and estimates from contractors, some in required computer program format, including an itemized inventory of discarded contents, descriptions, valuations and photographs in a CD format, all of which would be needed for the flood claim processing and payment. In reliance on those instructions, plaintiffs proceeded to arrange for the contents disposal, which was accomplished over the next few months.

24. In a subsequent phone call to flood adjuster Alexander on November 28, 2012, he further advised deponent that no special form was needed for the total flood claim submission, provided it included all the information and documentation previously noted, and that the proof of loss form requirement had been waived for this latest hurricane.

25. Plaintiffs' compliance with such instructions is reflected in a January 7, 2013 letter, with inventory, valuation and a photos CD of 97 separate contents items plus 21 separate building items, and then a February 20, 2013 total flood claim submission by plaintiffs to defendant's flood adjuster Alexander (Exhibit 14).

26. An undated form letter, received by plaintiffs shortly thereafter from defendant, in March 2013, consistently confirmed the above noted advice from defendant flood adjuster Alexander that a FEMA "conditional and partial waiver will permit Liberty Mutual to adjust and pay a loss based on the evaluation of damages in the adjuster's report instead of the signed Proof of Loss" and that,

"[a]s part of this rapid claims process and under this waiver, the requirement ... that losses will be payable 60 days after the insurer receives the insured's proof of loss…will not apply." (Exhibit 15). Such letter is referred to in defendant's chronology of claim activities as "[p]roof of loss waiver for meteorological event Sandy letter set." (Exhibit 11).

27. In the aforementioned November 28, 2012 phone call with flood adjuster Alexander, he also advised deponent that a defendant reserve for plaintiffs building and contents claim payment had been established at $120,000 to $140,000, which is confirmed in his preliminary report (Exhibit 13), wherein it is stated under the heading of Insurance Reserves, that a total of $135,000.00 has been reserved for such purpose, comprising $115,000.00 for building losses and $20,000.00 for contents losses. Based on that flood adjuster advice, plaintiffs retained a remediation contractor and follow-up specialty contractors for the repairs and restoration work to follow (Exhibit 14).

28. The February 20, 2013 total flood damage claim for plaintiffs, noted above, was in the total amount of $121,224.42, comprising a building loss of $101,224.42 and contents loss of $48,520.00, limited to $20,00.00 per the policy contents cap (Exhibit 14), which, independently and coincidentally, was highly consistent with the loss reserve established by defendant.

29. Notwithstanding all of the foregoing, defendant's flood adjuster Alexander prepared a three-page final report dated March 20, 2013, reversing all he had previously advised plaintiffs, and which recommended payment of $33,630.39 for building loss and $716.00 for contents loss, and wherein he states under "closing comments" that "[w]e have discussed our findings with the insured and the insured is in agreement with our adjustment. We e-mailed the insured a copy of the estimate on 3/19/13." (Exhibit 16, third page, defendant document PC 000048 from its Claim File). In point of fact, there was neither at that time nor ever any such discussion or adjustment agreement between

plaintiffs and defendant's flood adjuster Alexander; moreover, neither on 3/19/13 nor at any other time did he e-mail a copy of his estimate, which instead had to be obtained by plaintiffs from defendant's flood claim office, since the first plaintiffs' awareness of this drastically reduced payment recommendation, was upon subsequent receipt of the "final payment" checks from defendant.

30. The aforesaid recommended flood claim payment by defendant's flood claim adjuster was approximately $100,000 less than the building and contents reserve he had previously established on behalf of defendant, and also substantially below the $121,224.42 flood claim submitted by plaintiffs, which had been prepared precisely in accordance with such flood adjuster's specific instructions, including the inventory, valuation and photographing of some 100 items of compensable contents for disposal as debris, and which he then ignored in his final recommendations.

31. In a subsequent phone conversation with a defendant claims examiner, Michael Fiel, indicated to have been a colleague of defendant claims examiner Carter, deponent was advised that the plaintiffs had every right to rely on the flood adjuster's word.

32. On March 21, 2013, defendant transmitted to plaintiff two checks, each marked "loss paid in final" in the aggregate amount of $4,346.39, which, together with earlier advance payments resulted in a total amount of $34,346.39 paid on plaintiff's flood claim, the same amount as recommended in the flood adjuster's final report. Defendant admits this statement (Exhibit 4, defendant Rule 56.1 statement, p. 6, para. 22).

33. In an April 16, 2013 phone conversation with defendant claims examiner Carter, deponent was advised that the full contents claim up to the policy limit of $20,000, less deductible, would be allowed, together with all appropriate previously disallowed building items, which would be

re-evaluated by a replacement flood adjuster. This is confirmed in Carter's entry of that date, in defendant's claim chronology, which states in part, "we now have coverage for the contents and additional dwelling items." (Exhibit 11).

34. On the very next day, April 17, 2013, defendant claims examiner Carter wrote in the claim chronology: "[s]poke with the insured as requested. Advised I have been in touch with FG and we will move as quickly as possible." (Exhibit 11).

35. In a manner similar to the position reversal of defendant flood claim adjuster Alexander, by letter dated July 2, 2013, defendant claims examiner Carter advised plaintiffs that "[r]egretfully, your claim for additional contents reimbursement is denied." Defendant admits this statement as being " an accurate representation of the letter submitted to the plaintiffs." (Exhibit 4, defendant Rule 56.1 statement, p. 6, para. 25).

36. In a phone conversation shortly thereafter, defendant claims examiner Carter advised deponent that, if the plaintiffs chose to place items of furniture and other valuables in the dwelling basement, they did so at their peril, since there was no defendant flood insurance coverage for those types of items in such location.

37. At the time of the prior 2005 flood at plaintiffs' dwelling, with subsequent full building and contents claim payment by defendant, and at the time of the 2012 Hurricane Sandy flood and subsequent reduced claim payment, the configuration and elevations of the dwelling's lower floor or basement were the same, as were the defendant's flood insurance Renewal Declarations (except for premiums and coverage limit amount increases over time) and the FEMA applicable regulations and guidelines for coverage. Notably, defendant admits "that the configuration and elevation of plaintiffs'

basement were the same", but "disputes" the other factual allegations "as not being supported by cited, admissible evidence". (Exhibit 4, defendant Rule 56.1 statement, p. 7, para. 27), although the identity of insurance Renewal Declarations in 2005 and 2012, as well as the applicable FEMA regulations at those times, are facts which defendant would absolutely know from its records and knowledgeable flood claims personnel (see, e.g., para. 13 above and referenced exhibits).

WHEREFORE, on behalf of plaintiffs, it is respectfully submitted that the above indisputable facts and applicable law set forth in the accompanying memorandum warrant denial of defendant's summary judgment motion and the granting of plaintiffs summary judgment cross-motion as to the issue of liability only, with bifurcation and subsequent disposition of the damages entitlement issue.

Jack S. Kannry

Sworn to before me this
5th day of September, 2014.

Notary Public

LEONARD SCHINDLER
NOTARY PUBLIC, State of New York
No. 01SC4679010
Qualified In New York County
To: Commission Expires July 31, 2018

Schedule
of Exhibits

KANNY V. LIBERTY MUTUAL
EDNY Case 2:14-cv-01539-GRB
Summary Judgment Motions

## SCHEDULE OF EXHIBITS

| Exhibit No. | Description |
|---|---|
| 1 | March 5, 2014 plaintiffs' complaint (Docket Document 1) |
| 2 | April 2, 2014 defendant answer (Docket Document 12) |
| 3 | June 6, 2014 plaintiffs' statement of material facts per Local Civil Rule 56.1 (Docket Document 37-1) |
| 4 | June 20, 2014 defendant statement of material facts per Local Civil Rule 56.1 (Docket Document 37-2) |
| 5 | March 15, 2012 – March 15, 2013 defendant flood policy renewal declarations for plaintiffs' dwelling |
| 6 | February 2009 FEMA Flood Insurance handbook (FEMA F-687) extracts |
| 7 | March 15, 2005 – March 15, 2006 defendant flood policy renewal declarations for plaintiffs' dwelling |
| 8 | January 16, 2006 plaintiff e-mails with defendant flood adjuster and final statement of loss report by adjuster for defendant processing |
| 9 | February 15, 2006 defendant check to plaintiffs for building and contents flood loss, as recommended by flood adjuster |
| 10 | August 6, 2013 defendant claims history of 2005 flood claim, showing contents basement location and full payments |
| 11 | August 16, 2013 defendant claims examiner Jeffrey Carter log entry re 2005 file photos showing basement walk out, warranting area not being rated as basement and coverage for contents and additional dwelling items – chronology also includes March 21, 2013 "[p]roof of loss waiver for meteorological event Sandy letter sent" |
| 12 | March 20, 2013 FEMA Final Report with 2005 flood repairs completed under "premises history" |

{851115.1}

| | |
|---|---|
| 13 | February 6, 2013 defendant flood adjuster Preliminary Report, noting household contents located in first floor and above, but not in basement, and establishing claim payment reserves at $115,000 for building and $20,000 for contents |
| 14 | February 20, 2013 plaintiffs' total flood damage claim submitted to defendant flood adjuster, including January 7, 2013 letter with CD of requested photos |
| 15 | Undated defendant form letter to insureds as to rapid claims process and proof of loss waiver |
| 16 | March 20, 2013 defendant flood adjuster Daniel Alexander final report |

{851115.1}