UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
IN RE HURRICANE SANDY CASES
-----------------------------------------------------------------X
JACK S. KANNRY and JOYCE F. KANNRY,            )
                                               )
                            Plaintiffs,        )   Case 2:14-cv-01539-GRB
                                               )
            -against-                          )   PLAINTIFFS SUPPLEMENTAL
                                               )   SUBMISSION AFFIDAVIT
LIBERTY MUTUAL GROUP INC.,                     )   **IN SUPPORT OF CROSS-MOTION**
acting by and through its LIBERTY              )   **FOR SUMMARY JUDGMENT**
MUTUAL FIRE INSURANCE COMPANY,                 )
                                               )
                            Defendant.         )
-----------------------------------------------------------------X
STATE OF NEW YORK     )
COUNTY OF NEW YORK    ) ss.:

  JACK S. KANNRY, being duly sworn, deposes and says:

  1. Deponent is a plaintiff in the above captioned action, is personally familiar with the facts, events, circumstances, proceedings had and documents served herein, and submits this affidavit in support of the plaintiffs cross-motion for summary judgment, pursuant to order of this Court dated April 17, 2015. The statements herein are true, based on his own personal knowledge or, in the instance of the documents annexed as exhibits hereto, on information and belief, based upon deponent's review of such documents produced to plaintiffs by defendant in accordance with this Court's order in *Raimey vs. Wright National Flood Insurance Co.*, [EDNY Case 2:13-cv-02079-SJF-GRB, November 7, 2014, USMJ Brown, and as to which latter statements, he believes to be true, as set forth below.

  2. This Court, in *Raimey*, required that defendants in all Hurricane Sandy cases, provide to plaintiffs

> *any drafts, redlines, markups, reports, notes, measurements, photographs and written communications related thereto –*
> prepared, collected or taken by any engineer, adjustor or other

{885699.1 }

agent or contractor affiliated with any defendant, relating to the properties and damage at issue in each and every case, *whether such documents are in the possession of defendant or any third party.*

## Unexplained Variance in Reserve Established by Defendant for Plaintiffs Claim

3. Plaintiffs have selected certain of such documents produced by this defendant as being in further support of its summary judgment cross-motion. However, prior to addressing such specific documents, since a number of them relate to the "reserve" established by defendant, through its flood adjuster, for the compensable loss on this subject property, plaintiffs submit that some definitions are in order as to the terms "loss reserve" and "case reserve", as used in the insurance industry, generally, and by this defendant, specifically, in the instance of flood insurance claims. A website search by deponent under "Liberty Mutual Flood Insurance Claims" yielded the following documents:

a. The International Risk Management Institute, Inc. (IRMI) defines the term "loss reserve" as "[a]n estimate of the value of a claim or group of claims not yet paid.", and further that "[a] case reserve is an estimate of the amount for which a particular claim will ultimately be settled or adjudicated."

b. As to comparable definitions for this defendant specifically, the same website includes a 4-page document by the defendant entitled "Cautionary Notice Regarding Forward-Looking Information" in which it is stated that:

> the Company is required to maintain adequate reserves to cover its estimated ultimate liabilities for unpaid claims and claim adjustment expenses ("loss reserves" or "unpaid claims and claim adjustment expenses"). Reserves for these liabilities are typically composed of (1) case reserves for claims reported... . Case reserves represent reserves established for reported claims." (Exhibit 17, fourth page).

4. With reference to the above noted definitions of "loss reserve" and "case reserve", the February 6, 2013 defendant flood adjuster preliminary report, noting household contents located in first floor and above, but not in basement, and establishing reserves at $115,000 for building and $20,000 for contents (Exhibit 13 to prior motion submission) is totally consistent with deponents statement in the plaintiffs moving affidavit (p. 9, para. 27), that "[i]n the aforementioned November 28, 2012 phone call with flood adjuster Alexander, he also advised deponent that a defendant reserve for plaintiffs building and contents claim payment had been established at $120,000 to $140,000 ... ." However, in an earlier version of that preliminary report, dated December 10, 2012, which also notes household contents located first floor and above, but not in basement, the reserve was established at $85,000 for building and $0 for contents (Exhibit 18).

5. Although no explanation, calculations, drafts, redlines, markups, notes or other writings have been furnished by defendant to explain how either or both of such reserve amounts were established in the two preliminary report versions, defendant has furnished, as a *Raimey* supplemental document, a screen shot listing of dates of its preliminary reports and the fact that the February 6, 2013 version had been "revised" (Exhibit 19), but, again, without any explanation or supplementary documents showing the basis for such revisions.

6. Neither of those preliminary report reserve amounts were reflected in the March 20, 2013 final report by defendant flood adjuster, which recommended payment of only $33,630 for building loss and $716 for contents loss (plaintiffs prior moving affidavit, p. 9, para. 29 and Exhibit 16).

7. The defendant website noted above includes a four-page document entitled "Liberty Mutual Insurance Home Claims", which notes that "Liberty Mutual has a Centralized Catastrophe Unit which is available to immediately respond to areas that have been impacted by storms." (Exhibit 20, p. 3).

8. That is the defendant unit, which initially advised deponent, upon phoning in the claim, is to the assigning of a flood adjuster, who would be the principal defendant point of contact for plaintiffs throughout the claim process. This same defendant document, on the subject of processing contents (personal property) claim, further advises insureds that "[a]ll damaged items you are making a claim for should be retained until an agreement is reached or *you are instructed by your adjuster to discard the damaged items*." (Exhibit 20, p.2). Additionally listed therein are the types of contents information needed for such claim, which closely parallel the directions provided to plaintiffs by defendant flood adjuster Daniel Alexander.

9. This supplements the plaintiffs' summary judgment cross-motion in the following respects:

    a. Deponent previously stated, in plaintiffs summary judgment moving affidavit (p. 8, para. 23) that:

> During that same initial dwelling inspection, flood adjuster Alexander instructed plaintiffs to discard as debris, all of the lower floor contaminated contents, and to provide a detailed flood claim report with requested invoices and estimates from contractors, some in required computer program format, including an itemized inventory of discarded contents, descriptions, valuations and photographs in a CD format, all of which would be needed for the flood claim processing and payment. In reliance on those instructions, plaintiffs proceeded to arrange for the contents disposal, which was

accomplished over the next few months.

b. Related to this, in the same moving affidavit (p. 10, para. 31), deponent stated that "[i]n a subsequent phone conversation with a defendant claims examiner, Michael Fiel, indicated to have been a colleague of defendant claims examiner Carter, deponent was advised that the plaintiffs had every right to rely on the flood adjuster's word."

**Defendant Claims Examiner Carter Advice as to Contents Compensability, Subsequently Reversed**

10. Defendant claims examiner, Jeffery R. Carter, following his review of the flood adjuster's final report, advised deponent in an April 16, 2013 phone conversation "the full contents claim up to the policy limit of $20,000, less deductible, would be allowed, together with all appropriate previously disallowed building items, which would be reevaluated by a replacement flood adjuster." (prior moving affidavit, p. 10, para. 33).

11. As reflected in an e-mail exchange on the very next day, April 17, 2013 between defendant claims examiner Carter and its flood claims supervisor, Clint Miller, to whom the flood adjuster who authored the preliminary and final reports, Daniel Alexander, reported, Carter noted that "[w]e have $20,000.00 contents coverage and from what the insured is telling us the contents submission will reach the limits. I would like to get this resolved and the contents check sent out as soon as we can." In a responding e-mail from defendant's flood claims supervisor Miller, he states to Carter "[j]ust to clarify, you would like for us to revise the original estimate to be a pre-firm, elevated building which would allow coverage to the entire lower level including coverage for all damaged contents… correct?" The reply from defendant's claim examiner Carter was a single word "correct." (Exhibit 21).

### Defendant Claims Manager Expressed Concerns as to FEMA Reimbursement Issue if Plaintiffs Claim was Paid

12. In a further e-mail dated July 1, 2013, furnished by defendant as a *Raimey* document, Doreen Decker, defendant claims manager for flood insurance services, states to defendant claim examiner Jeffery Carter, that the real issue is the prior defendant payment on a 2005 claim for all basement contents, which could be "opening a can of worms and LM will no doubt have to pay back the $16,000 in contents that was paid by their prior vendor on the 2005 claim." (Exhibit 22).

13. In a July 31, 2013 e-mail from Ms. Decker to defendant's presidential service team, she expresses the same concern and further that "[i]f litigation were initiated, FEMA would most likely not reimburse Liberty Mutual for legal expenses due to payment of the prior loss." (Exhibit 23).

14. The stated position of defendant expressing concern as to potential reimbursement to FEMA on a prior flood claim to plaintiffs, as well as not being reimbursed by FEMA for litigation costs in this action, is offered to supplement Point II of the prior plaintiffs reply memorandum of law in support of the cross-motion (pp. 5-9), as to defendant's misplaced reliance on C.F.R. Pt. 62, App. A, since FEMA does not cover out of scope litigation claims based on insurer misrepresentations, as claimed here by plaintiffs.

### Conclusions

15. The limited documents furnished by defendant, pursuant to the Court's *Raimey* directive, which did not include any drafts, redlines, markups, notes and/or calculations of varying loss

reserve estimates, are further supportive of plaintiffs summary judgment cross-motion in the following respects:

    a. Loss or case reserve estimates by defendant of the compensable amount for plaintiffs claims, while inexplicably varying in the few months following Hurricane Sandy, showed in the last preliminary report submitted by the defendant flood adjuster, just weeks before his final report with greatly reduced amounts, a consistency with such adjuster's early representation to plaintiffs, i.e., that a defendant reserve had been established for this claim of $135,000 for building and contents loss.

    b. Defendant's claims insurance flyer, consistent with the statement by a defendant claims examiner to plaintiffs, as to reliance on such adjuster's word, warranted plaintiffs discarding of such contents as contaminated, pursuant to the flood adjuster's representation that such loss was compensable.

    c. Defendant's claims examiner advised its flood claims supervisor (to whom the flood adjuster reported) to revise the claim estimate to include as compensable damages the entire lower level of plaintiff's residence, including all damaged contents, less than a month following the flood adjuster's final report, which had sharply reduced amounts, but that revision was never made.

    d. There was concern expressed by defendant's claim manager for flood insurance services, that plaintiffs' claims based on insurer misrepresentation, if paid by defendant, would not be reimbursed by FEMA, nor would defendant's costs for out of scope litigation defense.

**WHEREFORE**, on behalf of plaintiffs, it is respectfully submitted that the above supplemental facts as reflected in the indicated *Raimey* documents produced by defendant, further support the related factual averments and annexed documentary exhibits included in plaintiffs cross-motion papers, together with the applicable law in the accompanying memorandum and reply memorandum of law, all of which warrant the granting of plaintiffs summary judgment cross-motion as to the issue of liability only, with bifurcation and subsequent disposition of the damages entitlement issue, as well as denial of defendant's summary judgment motion for the reasons set forth in plaintiffs prior motion papers.

                                                                            Jack S. Kannry

Sworn to before me this
30th day of April, 2015

_____
Notary Public

JEANNETTE E PERRY
Notary Public - State of New York
NO. 01PE6090088
Qualified in Nassau County
My Commission Expires 04/07/19

To:  Gail M. Kelly, Esq. (via e-mail: gkelly@conwayfarrell.com and regular mail)
      Kevin J. Kelly, Esq. (via e-mail: kkelly@conwayfarrell.com and regular mail)
      Conway, Farrell, Curtin & Kelly, P.C.
      48 Wall Street, 20th Floor
      New York, NY  10005

# Schedule Of Exhibits

**KANNRY V. LIBERTY MUTUAL**
**EDNY Case 2:14-cv-01539-GRB**
**Supplemental Submission on Summary Judgment Cross-Motion**

## SCHEDULE OF EXHIBITS

| Exhibit No. | Description |
| --- | --- |
| 1 - 16 | Included in September 5, 2014 notice of cross-motion and plaintiff affidavit |
| 17 | Loss reserve and case reserve on flood insurance claim defined for insurance industry, generally, and for Liberty Mutual, specifically |
| 18 | December 10, 2012 defendant flood adjuster Preliminary Report, noting household contents located in first floor and above, but not in basement, and establishing reserve at $85,000 for building and $0 for contents |
| 19 | February 7, 2013 defendant "screenshot" re preliminary report "revised" |
| 20 | Liberty Mutual Insurance Home Claims flyer on website |
| 21 | April 17, 2013 e-mail exchange between defendant claims examiner and flood claims supervisor re payment for all damaged contents |
| 22 | July 1, 2013 e-mail from defendant claims manager to claims examiner re potential concern of paying back FEMA on 2005 claim |
| 23 | July 31, 2013 e-mail from defendant claims manager to presidential service team re concern of reimbursing FEMA on 2005 claim and no reimbursement of legal expenses if insured initiates litigation |